Good morning, your honors. I'm Virginia Hopman, and I represent the plaintiffs below, General Harley Hughes. We're appealing two decisions by the district court from the Eastern District of Virginia that affect separately the two defendants here, IRT LLC and IRT Inc. Regarding LLC, we appeal the district court's grant of summary judgment at the pleading stage before any discovery or even answer. Dismissing Hughes' claims for fraud, promissory estoppel, fraudulent conveyance, and unjust enrichment. This decision was contrary to Maryland law and also violated well-established summary judgment standards. Well, it's universal laws, and it was dismissed on the notion that the reliance was unreasonable. Was unreasonable per se. As a matter of law. As a matter of law. Regarding Inc., and Inc. has not appeared in this court on appeal, we appeal the district court's denial of General Hughes' severance benefits, including any enhancements that might have been available under Maryland law. Because this decision, we believe, was contrary to Maryland's doctrine of prevention. The crux of the appeal, as you know, your honor, is the doctrine of what? Prevention. The district court found that Hughes was not entitled to severance benefits. Because the conditions weren't satisfied. And the condition was that he had to have signed a waiver or release in the form given to him by Inc. Well, he was the CEO of Inc., wasn't he? And had a controlling interest in Inc. He was Inc. Well, he was Inc. up until the point in time that Inc. sold all its assets. No, he was up until they closed. Right, up until the time. He left the office, you remember? He left the office saying, they kicked me out. And so he goes home and leaves Inc. careless. Well, Ruiz. The question is, that's the time they needed him most, the days leading up to the closing. Well, the days leading up to closing, Ruiz, who was going to be the upcoming CEO of LLC, was in charge and was running operations.  He was in charge of Inc. until the closing. Right, Your Honor. Well, with regard to the severance, though, which was the issue that I'm. I understand. That severance issue, you shouldn't spend too much time because severance required a form that he did not sign. And he was never prevented from signing it because he controlled it. Well, Your Honor, I would just raise one point with respect to that. And that was that up until the point that he signed, he believed that he was entitled to the percentage of the pipeline that had been promised to him by LLC. The percentage of the pipeline was conservatively valued at $3.5 million. Well, do you get anything if you get a judgment against Inc. unless you also prevailed against the LLC? I mean, if Inc. has sold all its assets, what good does that do? Well, Your Honor, the answer to that question is I'm not sure. Because this case was terminated so early, after its decision came out, we discovered that the government contract that Inc. had bid on, that had been granted after the sale of assets, had been awarded to Inc. And as far as we could tell, without discovery, there had been no novation of that contract. But it had been assigned, had it not? Excuse me? It had been assigned, had it not? Well, under government contract law, you need to novate contracts if you're changing the awardee of the contract. Because there's a whole vetting process that the federal government goes through. But that doesn't affect Inc. That may affect the obligor. But the Inc. signed away all its interest in that contract at the closing. That's part of the assets. Well, I was just responding to Judge Agee's point. Well, I understand. But you're failing to take that into account. Well, I think, Your Honor, that if, in fact, the funds had gone through Inc. at the time that the $45 million flowed through from the contract, then at that point in time, there still remained a severance obligation to General Hughes. And that would be an additional grounds for fraudulent conveyance. Why don't you move on to your LLC arguments? I will, Your Honor. I'd just like to finish one point with respect to the other. The $3.5 million pipeline percentage that he'd been promised precluded him from making a claim for severance under the contract with Inc. Because it exceeded the value of the severance. If you look at the contract, it's a joint appendix, page 265, paragraph 4. So therefore, during the time he had control of Inc. Which contract were you just referring to? The employment contract that gave rise to the severance benefits. So during the time he had control of Inc., in light of that promise, he could not make a claim for severance. Except the promise you're talking about was a promise from LLC, not from Inc. Well, yes, Your Honor. But the severance provision provides that for this very situation. If, as a result of a liquidation event, he receives value in respect of his stock and other aspects in excess of the severance benefits, he could not make a claim. So under that very contract, during the time he had control, he didn't have a severance claim. Except you didn't have any pipeline benefits at that point. Well, he had the pipeline benefits. He just had a promise that he would get it, at least according to him. Well, he had the representations. And that segues me nicely into the other part of my argument, Your Honor. It's important to note, Your Honors,  much less dispute, the fact that the promises and the representations upon which Hughes relied had been made. They didn't do it in their statement of undisputed material facts. And they didn't do it in the affidavits filed by Ripley and Duffy in support of summary judgment. And key among these repeated misrepresentations were that after LLC purchased the assets of Hughes, Hughes would receive a consulting agreement with LLC, under which he would be a member of the newly formed four-person LLC board of managers. He would receive consulting fees for the work he did. I think we're fairly familiar with the factual part back and forth. I think we'd be more interested in the particular legal arguments. So for instance, is it your view under Maryland law that reliance in some circumstances can be unreasonable as a matter of law? Well, I think under the, I would say that, I would phrase that differently, Your Honor. But I would say that under Maryland law, reliance can be reasonable and present a jury question where you have pre-contractual promises or representations. Let's go back to my question. Is under Maryland law, as a matter of law, can it be unreasonable for an individual to rely on certain promises? As a matter of Maryland contract law, yes. I think if the plaintiff has sufficiently alleged and presented evidence that there was fraud involved or there were false promises involved in the pre-contract phase. So in your view, there can never be a circumstance recognized by Maryland law where reliance would be unreasonable as a matter of law? In a fraud case? Yeah. I definitely think it could be in a contract case. I hate to say never, Your Honor. I mean, if you didn't allege the elements of fraud, if you didn't provide any evidence with regard to it. What I understand the district court to have said here, interpreting Maryland law, is that generally it's a jury question on whether or not the reliance would be reasonable. But under the facts that have been presented by the parties up until this point, which I assume would mean there was under the summary judgment standard no facts of material dispute, that those facts showed as a matter of law, the plaintiff's reliance was unreasonable. That's what she concluded, yes. That's what the court said. So did she have, in the abstract, the authority to make that determination? In the abstract? I'm not understanding your answer whether or not it was possible under Maryland law. Not whether she made an error, but whether it was possible. Well, Your Honor, I believe at the pleading stage, like we had here where you had the complaint, I believe if you had failed to include the proper elements that would demonstrate reliance, if you'd failed to include any facts to create a jury question or create a question of fact, then yes, it would be possible under Maryland law. It's like negligence. Negligence is a question of fact, traditionally. But a complaint can allege facts which accepted as true wouldn't amount to negligence as a matter of law. Yes, I would agree with that. The same principle would apply in the reasonableness or not of reliance. Reliance has to be reasonable. And the court, in this case, concluded that in this factual circumstance, you could never show it was reasonable. Yes, she did, Your Honor. And we believe that was an error. We believe that she herself was making findings of fact and credibility determinations against general views. Because under Maryland law, the grounds she relied on, where you have pre-contract promises and misrepresentations, it can be reasonable as a matter of law, depending on the facts and circumstances, even if the terms themselves, the promises themselves, do not appear in the contract and the contract has an integration law. And the same is true regarding when you rely on a promise. Let me ask you, in the documents leading up to the consulting agreement, there was a man named LLC, L-I-N. At that point, he was talking about the level and amount and timeliness of the fees. He was going to get $100,000 for his directorship and $100,000 in fees on a sliding scale. And he wanted an advancement of those fees. There's never a complaint in there that that agreement didn't comport with what was told. Your Honor, I think. He just negotiates. As a matter of fact, he recites the agreement and asks for an alteration of it. And it doesn't look like he's protesting at all. Well, Your Honor, I just want to make sure that we're on the same page here. The emails that led up to the agreement didn't reference the consulting agreement at all. No, they were about the agreement itself. They were about the asset purchase agreement. No, no, no, no. I'm talking about that. You're talking about the post-closing email. Well, it's post-closing on the APA. No, it's post-closing on the board agreement. I understand, but his agreement had not been finalized. Yes, it had. He signed the signature page on February 5th. It was one of the many signature pages he signed along with all of the other documents. Two weeks later, he was basically approached by Duffy to essentially tell him that not only was he not getting the pipeline percentage, but that he was being kicked off the board as well. That was before, wasn't it February 23rd? Yes, the closing was February 5th, or February 6th. Those were after the closing, Your Honor. So they said, all right. They promised him he would be on the four-person board, he would receive the pipeline, and he would have consulting fees. They had him sign the signature page without seeing the agreement, which he requested to do. And then after the closing, she found that to be unconscionable, Your Honor. And that is one of the findings, the fact that she made. Because under the circumstances here, General Hughes had no reason to believe that they were not going to fulfill their promises. At that time, they treated him as a  You have the CEO of a corporation selling a multimillion-dollar corporation. They have a lot of oral discussions, and it's all going to be documented. He has a fiduciary duty, not only to his own investment, but to everybody else who's invested, to make sure that the deal goes through. He goes to a closing and says he signs every document without knowing what's in them. No, Your Honor, that is not what he said. He didn't know what was in those documents. He says, that's what he says. I never saw a document. He knew the essence of the terms of the document. He knew for a fact that $4.5 million, that BB&T had indicated that satisfied its position as a preferred shareholder, as well as its own to Inc. He knew that the other shareholders and the employees were going to be employed under the same terms and conditions and he had been reassured and promised by people he trusted that he was also going to be made whole because he was going to get a percentage of the pipeline, which was approximately equal to the value of his employment contract, plus his stock holdings at the time. And when he signed the signature page without reading the consulting agreement, he asked for a copy to review it. And he was told it's not available. They're all remote. Don't worry. Is that reasonable? I believe it is, Your Honor. I believe it's at least a disputed fact. A CEO who is going to lose all these rights to ask for a copy of the document and they say, no, it's not available, and then nonetheless sign it. I believe that that is a reasonable issue of fact, Your Honor, because first of all, okay, first of all, he would risk, if he refused to sign at that point in time, he would risk delaying the deal, which was taking care of all of his employees, was ensuring that the loan was taken care of, was ensuring that the gas masks were getting to the troops. Everybody else was signing signature pages. It was consistent with the other facts because they were being assembled remotely. And Your Honor, at the time, he was a member of the LLC board, which was part of that same package of promises. So he believed if there was any error in the document, he would be in a position to take care of it. And he believed that in fact they had, they were honoring their promises. He signed those documents not only from Inc, but also as a member of the newly formed LLC board. If there are no further questions, I reserve the right. All right, thank you. Mr. Marinello. Good morning, may it please the court. Michael Marinello on behalf of Apelli IRT LLC. Contrary to appellant's characterizations, this case is more accurately described as a desperate attempt by the appellant to disavow the contract documents that he signed. Not only on behalf of IRT Inc, but on behalf of himself. Of course, he only brought this action after accepting all the benefits that he was entitled to under his revised consulting agreement with IRT LLC. Specifically, that included salary over the course of six months, in addition to a car lease payment that continued throughout the term. Then and only then did appellant bring these various fraud and other claims against IRT LLC, challenging the validity of the APA. But the APA was all documented arm's length transaction as reflected in the hundreds of pages of documents that IRT LLC submitted in support of this motion. The terms of the APA are undisputed. And the fact that appellant approved and signed all these documents in all its various respects prompted IRT LLC to bring its early summary judgment motion. On appeal, appellant's arguments essentially boil down to two chief complaints. The first being that the district court improperly declined to accept his assertions at face value and to draw all the inferences that he was asking the court to draw. And the second being that the district court misapplied American law. And particularly, I think the crux of that second issue is- Well, she had to look at it in the light of what was favorable to him. She did, Your Honor. She did have to look at it- You agree she did that? Oh, I do agree she did that. I think she expressly said she did that. She was required to do that. And I'll jump to why that was okay now. The point, the well-accepted standards for summary judgment, as Your Honor points out, is the inferences that the court is asked to draw must be justifiable. This court's decision in a case that we cited in our brief, Sylvia Development Corporation versus Calvert County. This court explained that only reasonable inferences from the evidence need be considered by the court. The permissible inferences that the court's being asked to draw must still be within the range of reasonable probability. It's the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests on speculation and conjecture. That's not a unique principle to the Fourth Circuit. That draws from the Supreme Court's jurisprudence in a recent example of 2007. This is a case that we didn't cite in our brief, but I wanna read a quote from Scott B. Harris, 550 U.S. 372, again, 2007. Supreme Court said, when opposing parties tell two different stories, one of which is blatantly contradicted by the record so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. And this is my point, Your Honor, that just because appellant made certain factual assertions, the court's not obligated to automatically accept those or take those at face value, particularly where those assertions are contradicted by evidence in the record. In Scott, Scott also, like this case, involved an early summary judgment motion. Well, why don't you tell us why no jury could reasonably find for the plaintiff in this case? Why the jury could reasonably find for the plaintiff, Your Honor? Well, I, you know, your point would be that no reasonable jury could find for him. Tell us why that is so. No reasonable jury could find for the plaintiff. I'll start with the fraud claims. Counts one through four are what I collectively call the fraud claims. Each of those claims requires the plaintiff to prove that he reasonably relied on these representations he's imposing on IRT LLC. No reasonable jury could find that his reliance on those promises was reasonable. And that's because as a matter of law, Maryland law is clear that pre-contract oral representations that are directly contradicted by terms of a written contract, it's unreasonable as a matter of law for a part of the contract to rely on those pre-contract oral representations. That's the case, that is also a case of fraud. Appellate is trying to limit that to contract cases, but that's clearly the case of fraud. This court, when interpreting Maryland law on this issue in Cole Carl, Cole Carl involved allegations of fraud. In the court in Cole Carl, while basing its decision on actually a different element, the damage element, it did alternatively note that we do not think the plaintiff could reasonably have relied upon allegedly fraudulent statements in the face of plainly contradictory contractual language. Under that clear law, you have here the APA documents, which include the consulting agreement. The terms of those documents directly contradict what the appellant is claiming IRT LLC representatives told him. So is it unreasonable as a matter of law for the plaintiff here to have signed the signature pages without having the documents in front of him, rest of the agreements in front of him as he alleges? I think it's absolutely unreasonable, Your Honor, and that's what the court below decided and she correctly decided. Well, we know that's what they decided. Tell us why under Maryland law that's the case. Under Maryland law, the law presumes that a person, first of all, presumes that a person knows the contents of the contract that he or she has signed. I think one of the cases that we cited in our brief, or a couple of the cases, we cited several cases for this proposition that when you sign a document without reading it, particularly when you have the ability and the opportunity to do so, you do that at your own risk. And the consequences of that are gonna be your own to bear. Several of the cases we cited involved the attainment of a release from a party. In particular, Gingell v. Bacchus and Spitz v. Baltimore, Ohio. In those cases, the plaintiffs were injured on the job, they ended up signing a release. When they later brought claims to recover damages for their injuries, the defendants brought up the releases in their defense and said, you've released these claims. The plaintiffs each indicated, you obtained those releases by us by fraud. In each of those cases, there were different circumstances, but in those cases, the plaintiffs had failed to read or understand the releases that they were signing. And the Court of Appeals of Maryland, in particular, at the Spitz case, explained that it would lead to startling results if a person who executes without coercion or undue persuasion a solemn release under seal can subsequently impeach that on the grounds of his own carelessness. And it explained that that person cannot invoke his own heedlessness to impeach that release and call it someone else's fraud. And that's exactly what appellant is trying to do here. There is no question. I thought the district court went further than that here and relied heavily on the plaintiff as being a sophisticated businessman and having an extensive high-level executive experience in the military, that that put him in a different class than someone off the street who might sign a release. That's right, Your Honor. I think that's an added factor. So I think the law is clear that any person who proceeds in this fashion is acting unreasonably, but it is appropriate to consider who that person is, their experiences, their background. So somebody like the appellant, retired three-star general from the Air Force and an experienced, sophisticated businessman, somebody in his position who also makes this decision to proceed in that fashion is acting even more unreasonably. So there's no dispute that here, Judge Niemeyer pointed out, this is a time when IRT, Inc. needed him most. This is when IRT, Inc. needed him to be leading the company. And here he's telling the court, well, Coleman Ruiz was in charge. Ruiz wasn't in charge of Inc., he couldn't be, as the court has pointed out. He was coming in as the president and CEO of LLC. Appellant remained as the president and CEO. Whether he wants to describe him having left the office and simply not participating in the closing of the APA, that was his choice. That was his decision to make, and that's the decision that he did make. With respect to... As a matter of record, when they did the walkthrough on the documents before the closing, do we know what documents they were looking at? Your Honor, if you're referring to the closing date, when they had all the documents they were getting... There was an email that suggested, I'd like to do a walkthrough, I think is the term they used. Correct, Your Honor. They went through the documents and the next morning they arranged it and he said, fine, they did a walkthrough. Is the record sure what documents they walked through? I don't believe it does, Your Honor, and I'm not sure that's even exactly how it occurred. I think the only conclusion we can draw from the record evidence, in fact, particularly the email, is IRT Inc.'s counsel sent the latest revision of what I believe was the last revision of the APA itself, the actual asset purchase agreement. To Appellant and the other senior executives and indicated, I'd like to walk through this document and address any concerns that you have. I don't know whether the fact that phone call... I mean, Appellant responded and said, roger that, in good military fashion. I don't know, there's no evidence in the record of whether that walkthrough actually happened, whether it was by phone, whether it was in person. So I can't answer that definitively. But I would state that there is no question Appellant had daily access to the IRT Inc. counsel who were negotiating the documents, and he was being, his input was being solicited. His questions were being answered. And I do want to address, in particular, the consulting agreement, because plaintiff is making... When do you say he got the consulting agreement in reference to the closing under the asset purchase agreement? Well, I can state with a fact that IRT LLC's counsel emailed that document to IRT Inc.'s counsel on February 3rd of 14, three days prior to closing the transaction. Two days later, on the 5th, Appellant signed the document. And we know that... He signed which document? He signed his consulting agreement. So the asset purchase agreement required offer letters to be provided to Appellant and the other two senior executives prior to closing. So the record reflects, I take it then, that the plaintiff signed the consulting agreement the day before the closing under the asset purchase agreement. That is correct. That is correct, Your Honor. He signed that the day before the closing of the APA. Now he's saying, I only signed the signature page, I didn't see the document. But we know that the entire document, in its entirety, was sent to his counsel. How many pages was it? I believe it's about nine or 10 pages, Your Honor. I also want to point out that he signed that document twice. And the reason I say that, and these are the emails that Judge Demeyer was referring to post-closing, about 20... Lawyers have them sign each page, traditionally, at the bottom and things like that, and then you don't have any issues like this. I think it issues... Lawsuits and appeals and everything. I think that's an excellent practice, Your Honor, that probably would have avoided where we are today. But I do want to point out that Appellant did actually sign a consulting agreement twice. The emails that were referred to during a counsel for appellants argument earlier, 20 days... Appellant signed the consulting agreement two days prior to closing. So there is an initial, what we call, the original consulting agreement. After the closing, IRT, LLC, and Appellant renegotiated the terms of his consulting agreement. And that's... Those are the emails that are referenced 20 days after closing. You see an email from Appellant to Joe Duffy of IRT, LLC, referencing his, quote, current signed agreement between himself and IRT, LLC. And he describes the terms of the consulting agreement. So there's no question. We're talking two to three weeks after the closing. We have direct, indisputable evidence that he's, in his own terms, describing the consulting agreement. So his allegation that he never saw that agreement until a year later is directly contradicted by record evidence. But my point is that the revised consulting agreement that resulted from those negotiations is substantially similar. It's almost exactly the same as the original consulting agreement. The only differences were that the term of his employment or the guaranteed salary was reduced from 12 years to six months. And that's essentially was the only change. All the other provisions remained the same. The covenant not to sue, the integration clause. They were all similar. So in effect, he signed those documents, the consulting agreement, twice. Never, never until all the obligations. IRT had paid out his salary. IRT had paid his $1,200 per month car lease. It was a legacy car lease from his time at IRT, Inc. After IRT had performed all those obligations, then he comes forward and brings claims for fraud and other claims against IRT, claiming that the APA and all the documents associated were obtained by fraud. I do want to quickly touch on the other claims. I think that Appellant's challenges on appeal primarily involve this reasonable reliance issue. But he does also challenge the success reliability, the denial, or the summary judgment on the success reliability and fraudulent conveyance claim, as well as his unjust enrichment claim. The district court properly evaluated and very meticulously evaluated the successor liability claim. Below, essentially what the court did is, it explained the elements of successor liability. It laid out exactly what Appellant was arguing in terms of why IRT LLC should have successor liability for the Inc.'s obligations. And she diligently went through that. The Appellant, in his brief, challenges and claims that the district court improperly applied Maryland law pertaining to fraud to the count five successor liability claim. The district court properly did that because the basis, what he was saying, the reason he was saying that IRT LLC should be liable under its successorship was because of fraud. He had alleged that. So the district court went back to its decision on fraud and said, there's no reasonable reliance here, so therefore, that doesn't work for successor liability. The Appellant, the second reason the Appellant asked for successor liability was fair consideration. The court evaluated that allegation by the Appellant and explained how from January, early January, when the letter of intent was provided and then signed by Appellant, he knew the price of the APA.  And over the next three weeks, was involved in the negotiations and ultimately signed the documents. So he can't come now as the seller to say, wait a second, IRT LLC, you didn't pay enough money. Despite the fact that I knew what you were going to pay and I still went ahead and signed the documents, I'm now claiming that you didn't pay enough money. She found that to be, as a matter of law, unacceptable. And finally- Is that an estoppel argument or what exactly is that? I don't know that it's an estoppel argument. I think it's essentially, it's an undisputed fact, obviously, that he was aware of the price. So for him to come back, it likely is an estoppel argument. I don't think it was articulated under any particular case law setting for the estoppel, but that is the point that you can't come back now after you've approved all these documents and say, well, that was an unfair price, I didn't like it. Because you signed it, you approved it in all respects. The District Court also addressed this fraudulent conveyance argument. And again, that requires fair consideration so the District Court determined that that argument under successful liability also fails. With respect to unjust enrichment, IRT LLC argued below and the District Court agreed that the appellant could not prove the first element of that claim, which is that he is required to prove he conferred a benefit on IRT LLC. The benefit that IRT LLC received from this transaction were the assets of IRT. Those are not the assets of appellant. So he personally did not confer a benefit. It was an agreement between LLC and Inc. Inc. pays for those benefits. In fact, Inc. probably, not probably, the benefit that Inc. received was actually the wiping out of his $10 million of legacy debt, not just the 4.5 million in purchase price. And I do want to just briefly touch on and reiterate why it was proper for the District Court below to enter summary judgment at a point as early as it did in this case. Summary judgment was entered very early, probably unusually so. It's not often that this happens. No discovery had been happened, but the District Court explained that, identified two factors, excuse me. And what the District Court identified was that the documents here are so clear that there's no basis to get into parole evidence and indicated that there's really no reason, there's nothing that the defendant could discover in discovery that's gonna alter these documents. They're so clear that he signed and approved them that summary judgment is appropriate at this early phase. And additionally, the early summary judgment contributed to the just, speedy, inexpensive resolution of this case without a trial. Already issues had begun to crop up, as we've indicated in our briefing, as can be seen in the docket. Discovery issues had already begun to crop up, and there was a motion that IRTLC had filed that explained, or was seeking a deadline of discovery, given the extreme expense it was gonna have to incur to respond to some of the electronic discovery requests that had been provided. So the District Court recognized that when you have a case so clear on overwhelming evidence, it's proper to dismiss early on summary judgment, avoid the cost, and conserve judicial resources. If there's no further questions, I will take a seat. Thank you, thank you, Your Honor. All right, Ms. Hoffman. Thank you, Your Honor. First of all, I would like to reiterate that this case does not involve a challenge to the asset purchase agreement itself. Most of the arguments that appellant made were with regard to the asset purchase agreement. The walkthrough that you referred to was with regard to the asset purchase agreement. LLC provided emails that they had sent not only. The reason I ask that is I thought that the APA referred to the side agreements and attached them as exhibits, it didn't. No, not at the time. At the end, when they assembled them all together. No, but I thought by its terms, referred to these letter agreements with the three principles. It said that agreements would be reached, but it didn't refer to any terms. Counsel says that the plaintiff signed the initial consulting agreement either a day or two days before the signing of the APA. Is that correct? There was one time that he went to the office and all of the signature pages were provided to him. Other signatories were doing the same thing. The lawyers were combining them remotely. He signed February 5th, February 6th, and the closing was like the next day. So, are you agreeing that he did sign the consulting agreement that was referenced in the asset purchase agreement the day before, at least the day before he signed the asset purchase agreement? No, you're right, it happened at the same time. It happened at the same time, it was the same day. He went once and he was given signature pages to board resolutions.  because he was a new member of the board. There were some things he signed on behalf of Inc. and he signed the signature page of the consulting agreement on his own behalf. Your Honor, in a police arguments, they argued that summary judgment is appropriate when one party makes unsubstantiated statements that are disputed by the other side, if they're not supported by the record. And Your Honor, there's no question that these representations were made. There's no question, in this particular case, Hughes is not challenging the $4.5 million payment. He understood, based on their representations and promises, that BB&T was satisfied, that its $10 million debt would be wiped out, and its position as a preferred shareholder would be satisfied. He understood that the other shareholders, officers, and employees were gonna be taken care of under the same terms and conditions they were at Inc. He was not, and he understood, based on their undisputed representations and promises, that he was going to receive the functional equivalent of that. He was gonna receive a percentage of the pipeline, which was approximately equal in value, to his employment contract, and to what he thought was the value of his stock at the time. So where would that have been represented? Well, he specifically said in his affidavit that initially, it was represented when he complained about the $4.5 million price. My point, what I meant was, wouldn't that have been set out in his consulting agreement, his terms of compensation? He believed that it was. He believed that it was, and he had, again, I believe he's made what would be a very good advocate's argument to the jury, that that was unreasonable. But there is a basis for sending this to the jury, Your Honor, because at the time, those numbers made sense. They were consistent with what the value was. Hughes presented expert testimony that the value of the assets at the time of sale was between 22 and 26 million. We know LLC flipped those assets within 15 months of the sale for 37 to 62 million. The 3.5 million was what he believed once you took out the BB&T debt, and you considered his 37% position, was a reasonable number. It made sense. The fact that he was asked to sign without seeing the consulting agreement, counsel said that it should not have been done, and Your Honors and Brinkman pointed out better practices, but he understood that the other signatories, including that of his people- Let me ask you a factual difference that I heard in your arguments and those of Mr. Maranelis. I had indicated to you that I thought all the revisions to the consulting agreement were made before the closing. In other words, when he was wiped out as CEO and just made a consultant, whereas the other two were retained. You said that was after closing. No, Your Honor. I'm now looking at his affidavit, and he said, after being told that I would not be CEO and president, I understood that I was to leave, and I packed up the office the following days. By January 30th, this is all in January, I was entirely out of the IRT offices. That was the position as CEO. Initially, they promised him he would be retained- I understand, but now this is violating the arrangement. In other words, and that's when he started making, I mean, they started talking about the consulting fees and so forth. That's when Duffy- The copies were mailed to Dwayne Morris and Heckscher, who represented him. They did not represent him, and you'll notice- So what, did they have a firewall between him and his communist attorneys? If you look at the emails that they attached, he was copied on all the APA documents. He was not copied on the consulting agreement that went to Dwayne Morris. These are factual questions with respect to- They're not factual questions.  I'm trying to find those out. Okay, undisputed- And the undisputed question was, he was told something totally different and majorly different before the closing. He was told he was being wiped out. No. And the other two, that's what he said. He said, I was out, and I left. He was not gonna be retained as CEO. He was told that. At the same time, he was told that he would be made whole by Duffy, whom he trusted. They'd had a co-financiary relationship. He was told by Duffy that he would be made whole because even if he wasn't CEO, they still needed him. They were gonna put him on this small, newly formed four-person board. They were gonna give him a percentage of his pipeline, which would basically compensate him as he would have been compensated under his employment agreement and pay him the value of the stock. And they were gonna pay him consulting fees. That happened before closing. Those were the representations that we're bringing up here. He did not sign the consulting agreement twice. He signed the signature page once. At the same time, all of the other documents were being signed. What the appellee refers to as- Had he read this nine or 10-page consulting agreement before he signed it, he would have seen that all the representations you've just described were not there. Well, that's not true. The one that was not there was the pipeline. He was a member of the board. They asked him to sign documents for them, for LLC. If you look at the closing documents- Wouldn't his pipeline thing have been in the consulting agreement? It should have been. He thought it was. Well, that was my question. Had he read the consulting agreement, wouldn't he have seen that all the representations that you recited- The pipeline representation, and he- Wait a minute. Oh, I'm sorry. That all these things that you've represented, he would have seen were not there. He would have seen the board membership. He would have seen the consulting fees. He would not have seen the pipeline percentage, assuming that what was appended to the documents three days later is what was available on the day of closing. But he asked for it. They told him it wasn't available. He trusted the people that he was working with. He'd been on the board with Duffy before he'd made the assurances. He knew they had made him a member of the board. At that point in time, we believe that's a jury question on whether it was reasonable, unreasonable. And counsel's simply wrong as a matter of Maryland law and fraud cases. I think, you know, I practiced in Maryland too. I thought that's an accurate representation that you signed documents in blank. You can't claim that there was fraud in the content of the documents if you were told something- You can't disavow them, Your Honor, as a matter of contract law. Even if you didn't read it, or didn't go through it at all. There are cases in Maryland that even an attorney, if it depends on the reason why you didn't sign it. And here- Not under the Maryland law. Well, that's what the Benjamin vs. Earp case says, Your Honor, I'm sorry. Basically, it says you're stuck by the document. That's the only way documents can go ahead. You'd be undoing almost every document if somebody had a different understanding whether on fraud or not, and isn't bound by the document. But let me ask you, why did he summarize the contents, accurately summarize the contents of his consulting agreement later in February if he had not seen it? He was told two weeks later by Duffy that now they were gonna renege on the board membership and kick him off the board. They'd gotten his signature, they didn't need him anymore. Except that's what he says in his affidavit, he was kicked off the board before the closing. No, he was not continued as CEO before the closing. He was told he was gonna be on the board, that if you look at the documents, Your Honor, they had him sign the closing documents, some of the closing documents, as a member of the LLC board. Two weeks later, they came to him and they said, look, you're not gonna be able to be kept on the board, we're gonna cut everything in half for you, and you better take it or leave it because you've got nothing left. And that was the context in which they say he renegotiated his contract. Okay, thank you. Thank you. We'll come down to Greek Council and then proceed on to the next case.
judges: Paul V. Niemeyer, Robert B. King, G. Steven Agee